**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

| | |
|---|---|
| **In re:** ) | |
| ) | |
| **ASIC BROWARD LLC,** ) | **Case No: 14-24273-RBR** |
| ) | |
| ) | |
| ) | **Chapter 11** |
| **Debtor.** ) | **Hon. Raymond B. Ray** |
| ) | |
| ) | |

**AFFIDAVIT OF CRAIG COHEN IN SUPPORT OF CHAPTER 11**
**PETITIONS AND FIRST DAY MOTIONS**

| | | |
|---|---|---|
| STATE OF NEW JERSEY | ) | |
| | ) | ss. |
| COUNTY OF BERGEN | ) | |

Craig Cohen, being duly sworn, deposes and states:

1.      I am the Manager of Asic Broward LLC (the "Debtor") and I am generally familiar with the day-to-day operations, business affairs, and books and records the Debtor.

2.      On June 23, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court").  I refer to the bankruptcy case arising from Debtor's petition as the "Chapter 11 Case."

3.      In order to enable the Debtor to minimize the adverse effects of its Chapter 11 Case, the Debtor has requested various types of relief in various "first-day" applications and motions (collectively, the "First Day Pleadings").  The First Day Pleadings seek relief aimed at, among other things, maintaining customer loyalty, maintaining vendor and supplier confidence,

{4923380:11}

retaining employees, promoting an efficient restructuring, and maintaining the Debtor's going-concern value.  I believe the relief sought in the First Day Pleadings is crucial to achieving these goals.

4.     I submit this Affidavit in support of the First Day Pleadings.  Any capitalized term not expressly defined herein has the meaning ascribed to that term in the relevant First Day Pleadings.  All facts set forth in this Affidavit are based on my personal knowledge, upon information supplied to me by others at the Debtor, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of the Debtor's operations, financial condition and their present liquidity crisis.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.

5.     Part I of this Affidavit describes the Debtor's business and the circumstances surrounding the commencement of the Chapter 11 Case.  Part II sets forth the relevant facts in support of each of the First Day Motions.

## I.  Background

### Debtors' Business

6.     The Debtor operates seven (7) Five Guys Burgers and Fries restaurants situated in the state of Florida and is in the process of developing an eighth location that was planned to be open during the Summer of 2014, with the following locations:

- 5701 North University Drive, Tamarac FL  33321 ("Tamarac");

- 7266 West Atlantic Blvd., Margate, FL  33063 ("Margate");

- 1818 Cordova Road, Fort Lauderdale, FL  33316  ("Harbour Shops");

- 11097 Pines Blvd., Pembroke Pines, FL  333026 ("Pembroke Pines");

- 6201 North Andrews Avenue, Fort Lauderdale, FL  33309 ("Cypress Creek");

- 801 South University Drive, Plantation, FL  33324 ("Plantation"); and

- 800 East Hallandale Beach Blvd, Hallandale Beach, FL 33009 ("Hallandale Beach");

- New planned location in Hillsboro Square Shopping Center, Deerfield Beach, FL ("Deerfield Beach")

7.      The Debtor's corporate headquarters is located at 1966 N.E. 123rd Street, North Miami, Florida 33181.

8.      As of the Petition Date, the Debtor directly employs 120 employees in the state of Florida who work in different capacities as in-store managers, cashiers, cooks, and other such job duties customary to the restaurant business ("Employees").  Of the Debtor's active Employees, 8 are salaried Employees and 111 are hourly Employees. The Debtor's consolidated gross sales for the calendar year 2014 are estimated to be $7.2 million.

9.      Each of the Debtor's seven (7) locations operates under a franchise agreement ("Franchise Agreement") with Five Guys Enterprises, LLC ("Franchisor"), under which the Debtor is required, among other obligations, to pay franchise fees and royalty fees to Franchisor on a weekly basis.

10.     The global operations of the Debtor is centrally managed through ASIC Management, LLC ("ASIC Operations"), a non-debtor, related entity of the Debtor (the controlling and operating member of Debtor), pursuant to certain management agreements ("Management Agreements") between the Debtor and ASIC Operations, under which the Debtor

is required, among other obligations, to pay management fees to ASIC Operations in the amount of $15,000 per month, as set forth in the Budget as part of the DIP Motion (defined below).

## Ownership

11.    As of the Petition Date, the members holding an ownership interest in the Debtor include:

- **Franfunding Broward, LLC owns 50% of Debtor's member interests**

- **Satish Roy owns 7.16% of Debtor's member interests**

- **Bharti Roy owns 7.14% of Debtor's member interests**

- **Vijay Patel owns 7.14% of Debtor's member interests**

- **Joshana Patel owns 7.14% of Debtor's member interests**

- **Kaushik Amin owns 7.14% of Debtor's member interests**

- **Minaxi Amin owns 7.14% of Debtor's member interests**

- **Chandrika Patel owns 7.14% of Debtor's member interests**

## Pre-Petition Loan Obligations

12.    Prior to the commencement of this case, Mida Farms, LLC ("**Mida Farms**" or "**Lender**")[1] provided financial accommodation to permit the Debtor to obtain credit from Bank Leumi USA ("**Bank Leumi**").    The Debtor is a party (either as primary obligor and/or co-obligor) to several secured notes and loan agreements (the "**Bank Leumi Loans**") with Bank Leumi, which are now owned and held by Mida Farms. The Bank Leumi Loans made by Bank Leumi are evidenced by, *inter alia*: (i) the May 18, 2012 Credit Agreement between the Debtor

---

[1] Franfunding owns 50% of the equity interest in the Debtor.  Asic Management, LLC owns 40% of Franfunding. Arital,96, LLC owns 25% of Asic Management, LLC.  Aristal 96, LLC is controlled by Isaac Arguetty.  Mr. Arguetty controls 10% of Mida Farms,.

and Mida Farms, as co-borrowers, and Bank Leumi, as lender; (ii) the April 26, 2013 Credit Agreement Amendment between the Debtor and Mida Farms, LLC, as co-borrowers, and Bank Leumi, as lender; (iii) the May 18, 2012 Loan Agreement between the Debtor and Mida Farms, LLC, as co-borrowers, and Bank Leumi, as lender; (iv) the May 28, 2012 Promissory Note; and the (v) the May 18, 2012 Security Agreement (the foregoing documents along with all related prepetition documents are "**Bank Leumi Pre-Petition Loan Documents**").

13.     Pursuant to the Bank Leumi Pre-Petition Loan Documents, Bank Leumi made (a) a $1,200,000 term loan (the proceeds of which were used to retire pre-existing indebtedness and some working capital) and (b) an $800,000 revolving loan to the Debtor evidenced by two separate advances each in the amount of $400,000.   The advances under the revolving loan were used for working capital and to finance some of the construction and build out of two of the restaurant locations operated by the Debtor.

14.     The financial accommodations provided by Mida Farms to the Debtor are evidenced by, *inter alia*, a Loan Agreement dated May 18, 2012 between the Debtor, Franfunding Broward, LLC, a Florida limited liability company ("**Franfunding**") and Mida Farms (the "**Mida Farms Agreement**").   Franfunding owns 50% of the equity in the Debtor. Pursuant to the Mida Farms Agreement, the Debtor acknowledged that (i) Mida Farms would provide financial accommodation to the Debtor as a co-maker under the Bank Leumi Pre-Petition Loan Documents, (ii) it would be liable to Mida Farms for amounts advanced by Bank Leumi to the Debtor, and (iii) it would pay Mida Farms (a)  a co-signing fee equal to 3% of the of the loan amount advanced by Bank Leumi and (b) interest on the advances at a rate not to exceed 12% per annum (of which the Debtor is liable for only 8.5%).

15.    To secure the obligations under the Mida Farms Agreement, the Debtor granted Mida Farms a security interest in and upon substantially all of its property.

16.    On June 9, 2014, Mida Farms acquired, by assignment, the Bank Leumi Pre-Petition Loan Documents.

17.    As of the Petition Date, pursuant to the Bank Leumi Pre-Petition Loan Documents and the Mida Farms Agreement, the Debtor owes Mida Farms $1,760,000 in principal, plus interest, costs and attorneys' fees.

18.    Mida Farms also provided working capital loans to the Debtor pursuant to the terms of the Loan Agreement dated October 27, 2013 between the Debtor, Franfunding and Mida Farms (the "**Working Capital Loan Agreement**").

19.    As of the Petition Date, pursuant to the Working Capital Loan Agreement the Debtor owes Mida Farms $410,000 in principal, plus interest.

20.    The Debtor and Mida Farms are also parties to (i) First Amended Revolving Demand Promissory Note dated May 27, 2014 in the amount of $200,000, and (ii) Security Agreement dated May 19, 2014 (together, the "**Revolving Loan Documents**").

21.    Pursuant to the Revolving Loan Documents, Mida Farms made several advances to the Debtor to finance the completion of construction of the retail locations owned by the Debtors and to provide working capital to the Debtor.

22.    As of the Petition Date, the Debtor owes Mida Farms $220,000 in principal, plus interest, costs and attorneys' fees pursuant to the Revolving Loan Documents.

23.    On May 20, 2014, Mida Farms filed a UCC-1 with the Florida Secretary of State, record number 201401454109, thereby perfecting its security interest under the Working Capital Loan Documents and Revolving Loan Documents.   Mida Farms' liens securing the advances

under the Working Capital Loan Documents and the Revolving Loan Documents are secured by liens on substantially all of the assets of the Debtor, which liens are junior and subordinate to (in order of priority) the liens of (i) Mida Farms' under the Bank Leumi Loan Documents, (ii) U.S. Foods, Inc.; ("**U.S. Foods Lien**") and (iii) Stockbridge Palm Lakes Plaza, LLC ("**Stockbridge Lien**", which lien attaches solely to the contents of the premises at the Margate location).

24.     Mida Farms owns and holds the Bank Leumi Pre-Petition Loan Documents, the Mida Farms Agreement, the Working Capital Loan Documents and the Revolving Loan Agreement (collectively, the "**Pre-Petition Secured Loan Documents**").

25.     As of the Petition Date, and pursuant to the Pre-Petition Secured Loan Documents, the Debtor was justly indebted to Mida Farms in the amount $2,345,000, plus interest, costs and attorneys' fees (the "**Pre-Petition Secured Indebtedness**").

26.     The Pre-Petition Indebtedness is secured by validly perfected and duly recorded and enforceable first priority liens in and upon substantially all of the Debtor's assets, including, but not limited to, all accounts, machinery, equipment and inventory, and the proceeds thereof, by the filing of UCC Financing Statements #201206800710 and #201401454109 ("**Pre-Petition Liens**").

27.     As of the Debtor's March 31, 2014 un-audited balance sheet, the approximate value of Debtor's assets securing the Pre-Petition Indebtedness consisted of the following:

| | | |
|---|---|---|
| Cash and Cash Equivalent Assets: | $ | 8,507 |
| Inventory: | $ | 40,725 |
| Fixed Assets, consisting: | | |
|    - Furniture, Equipment | | |
|    - Leasehold Improvements | | |
|    - Construction in Progress | | |
| | $ | 2,905,365 |
| Other Assets, consisting: | | |
|    - Goodwill | | |
|    - Trademarks | | |

     - Deposits
     - Intangibles

                                    $     2,262,533

28.     The asserted Stockbridge Lien is against all assets and property of the Debtor located within the Margate location to secure amounts owed by Debtor to Stockbridge under the July 16, 2005 real property lease. Upon information and belief, the Debtor is not in default of any of its obligations to Stockbridge.

29.     The asserted U.S. Foods Lien is an all asset lien and purchase money security interest to secure payment for goods sold to Debtor by U.S. Foods. Upon information and belief, the Debtor is not in default with respect to its payment obligations to U.S. Foods.

30.     The Debtor does not consent to the validity and enforceability of the Stockbridge Lien and U.S. Foods Lien and reserves all rights to dispute and challenge such liens.

**Recent Difficulties**

31.     Debtor currently controls the rights to develop up to 32 additional Five Guys restaurant locations in the Broward County area (the "Expansion Rights") pursuant to the terms of a certain Development Agreement with Five Guys (the "Development Agreement"). The Debtor has fully developed 7 restaurant locations, and is in the process of developing its 8th location in Deerfield Beach; however, is struggling to generate the cash necessary to complete construction.

32.     Prior to the Petition Date, the Debtor was actively seeking to refinance its secured debt in order to provide the additional capital necessary for Debtor to complete construction of the Deerfield Beach location during the summer of 2014 and continue the development and expansion of Debtor's business under its Expansion Rights with Five Guys (the "Refinancing").

33.     Contemporaneous with Debtor's efforts to effectuate the Refinancing, Debtor was also pursuing the sale of it business to a buyer who had access to the capital necessary to develop the business under the Debtor's current Development Agreement and Expansion Rights (the "Strategic Sale").

34.     Prior to the Petition date, Debtor (as well as non-debtor related entities) was sued by certain minority equity holders (the "Minority Equity Holders") asserting alleged derivative claims, breach of contract, and breach of fiduciary duty claims against the Debtor, certain of its members and other related entities (the "Lawsuit").

35.     Because of the Lawsuit, Debtor's Refinancing and Strategic Sale efforts have essentially been brought to a standstill, due to the concern by potential lenders and/or buyers that the Debtor will either lose or not be able to transfer its Expansion Rights and Development Agreement with Five Guys as a result.

36.     Therefore, in order to sustain operations and preserve the value of the Debtor's estate, the Debtor commenced this Chapter 11 Case.

## II.  First Day Motions

37.     Concurrently with the filing of the Chapter 11 Case, the Debtor has filed a number of First Day Motions, each of which is described briefly below.  I have reviewed each of the First Day Motions (including the exhibits thereto) and I believe that the relief sought in each of the First Day Motions:  (a) is necessary to enable the Debtor to operate in chapter 11 with a minimum of disruption; and (b) constitutes a critical element in maintaining the value of the Debtor's assets during the reorganization process.

**Debtor's Emergency Motion for Entry of Interim Order (I) Authorizing (a) Use of Cash Collateral Pursuant to 11 U.S.C. § 363, (b) Secured Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 AND 364(c) and (d), and (c) Granting of Security Interests,**

**Superpriority Claims, and Adequate Protection, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c) (the "DIP Motion")**

38.     The Debtor has filed a motion seeking authority to (a) use cash that may constitute cash collateral, (b) obtain post-petition financing, and (c) grant adequate protection on account to Lender ("DIP Motion").

39.     As set forth in the DIP Motion, without the use of its cash and the ability to borrow, the Debtor will be unable to fund the necessary costs and expenses of its ordinary course business operations or the administration of its bankruptcy estate.

40.     As set forth in the Budget attached to the DIP Motion, Debtor seeks authority to borrow up to $115,000 on an interim bases, plus up to an additional $105,000 (for a total of $220,000) upon the entry of a Final Order, on a first lien, superpriority basis.  The reality of the Debtor's current situation is that use of cash collections will not be sufficient to meet the Debtor's operating needs and fulfill its obligations to Five Guys under the Development Agreement.  Without additional financing, the Debtor will not have sufficient funds to meet payroll, purchase supplies, materials and other necessary items to provide services to its customers while the Debtor continues its reorganization efforts.  The Debtor requests, therefore, that it be authorized to enter into a postpetition financing arrangement with Lender, pursuant to which Lender will provide the postpetition financing set forth in the proposed Interim Order attached to the DIP Motion as Exhibit A (the "Financing Order").

41.     The Debtor urgently requires financing and credit under section 364 of the Bankruptcy Code to fund day-to-day operations and working capital requirements necessary to maintain services for its customers while pursuing the Refinancing or Strategic Sale.  Continuing services is necessary to preserve the Debtor's operations and is integral to the successful

restructuring of the Debtor, for maximizing the value of the Debtor's estate, and minimizing the claims against the Debtor pursuant to the provisions of chapter 11 of the Bankruptcy Code.

42.     Lender is willing to provide the Debtor with a DIP Loan (defined below) pursuant to the terms of the Financing Order.  The proposed DIP Loan is in the best interests of the Debtor and all other parties in interest.

43.     In summary, Lender's financing under the proposed Financing Order will consist of <u>interim</u> financing in the maximum amount of $115,000 available upon the entry of the Financing Order, and up to $105,000 of additional financing upon the Financing Order becoming a final Order (the "DIP Loan").

44.     The terms and conditions of the proposed Postpetition Financing are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, are supported by reasonably equivalent value and fair consideration, were negotiated by the parties at arms' length and entered into by the parties in good faith, and are the best available to the Debtor under the present market conditions and financial circumstances of the Debtor.  Lender's extensions of credit to the Debtor under the proposed DIP Loan are and will be made in good faith.  It is in the best interests of the Debtor, its estate, customers and creditors that the Debtor be immediately authorized to enter obtain the DIP Loan pursuant to the terms of the proposed Financing Order and to execute, deliver, perform and consummate the transactions and all documents and instruments referred to therein or contemplated thereby.

45.     Lender would make advances to the Debtor on the terms provided in the Financing Order.  The following are the key terms of the DIP Loan, with the location of such key terms within the Financing Order:

| **Material Provision** | **Summary Description and/or Location of Provisions in Relevant Documents** |
|---|---|
| Lender | Mida Farms, LLC. |
| Borrower | ASIC Broward LLC. |
| DIP Loan Guarantors | None**.** |
| Administrative Agent | None. |
| The purposes for the use of the DIP Loan | The proceeds of the DIP Loan shall be used by the solely for (a) working capital necessary to sustain ordinary course business operations of the Debtor (to the extent set forth in the Budget), (b) payment of necessary costs and expenses of administration of the ch. 11 estate, (c) such other reasonable and necessary expenses of the Debtor as allowed by Lender and this Court. **Interim Order, ¶¶ Z, 2, 12, and 13**. |
| Interest Rate | Prior to the occurrence of an Event of Default, 8.5%; 13.5% from and after the occurrence of an Event of Default. **Interim Order, ¶ 18.** |
| Scheduled Maturity Date | The DIP Loan shall mature and terminate on the earlier of (a) the occurrence of an Event of Default, (b) upon the sale of substantially all of the Debtor's assets in connection with or prior to confirmation of a chapter 11 plan, (c) upon confirmation of a plan, even if such plan does not call for the sale of any of the Debtor's assets, or (d) September 30, 2014. **Interim Order,¶ 19**. |
| Events of Default Under DIP Loan and Termination Events | The DIP Loan includes such events of default (each, an "Event of Default") as are usual and customary for debtor-in-possession financings of this kind, including (a) conversion or dismissal of this ch. 11 case, (b) appointment of a ch. 7 trustee, (c) entry of an order modifying, annulling or terminating the automatic stay in favor of any creditor asserting a lien on the DIP Collateral, and (d) failure of the Debtor to comply with the Budget or any term of the Interim Order. **Bank Leumi Credit Agreement, ¶ 11; Interim Order ¶ 17.** |
| Liens | Lender to receive senior, priming liens, subject only to the Carve Out on all DIP Collateral (excluding ch. 5 causes of action and claims); Replacement Liens on all Pre-Petition Collateral, subject to Permitted Liens and DIP Loan Liens. **Interim Order, ¶¶ 5, 7 and 8.** |
| Loan Amount | Up to $115,000 on interim basis; up to an additional $105,000 (total of $220,000) upon entry of a Final Order. **Interim Order, ¶ 3** |

| Material Provision | Summary Description and/or Location of Provisions in Relevant Documents |
|---|---|
| Superpriority and Priming Lien | Subject only to the Carve-Out, Lender shall receive a fully perfected, first priority security interest in all of the DIP Collateral (excluding ch. 5 causes of action and claims). **Interim Order, ¶ 5**.<br><br>Subject only to the Carve Out, superpriority administrative claim status pursuant to 364(c)(1) with priority over any and all other costs and expenses of administration of any kind, including those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise. **Interim Order, ¶ 14**. |
| Adequate Protection | Lender will receive (i) Replacement Liens on all Pre-Petition Collateral with the same validity, priority and to the same extent as held on the Petition Date, which shall be subject only to the DIP Loan Liens, Permitted Liens and the Carve Out,. **Interim Order, ¶ 7.** |
| Findings and Determination as to validity, enforceability, priority, or amount of Pre-Petition Secured Indebtedness | Finding that the Pre-Petition Secured Indebtedness is secured by validly perfected and duly enforceable liens in and upon substantially all of the Debtor's assets. **Interim Order, ¶ U.** |
| Waiver of surcharge under § 506(c) | Subject to the entry of a Final Order, but for the Carve Out, no expenses of administration incurred in the bankruptcy case shall be charged against or recovered from the DIP Collateral or Lender. **Interim Order, ¶ 9.** |
| Waiver or modification of Code provisions or applicable rules relating to the automatic stay | Upon the occurrence of an Event of Default, the Lender shall be entitled to an order terminating the automatic stay on an expedited basis. The Lender shall be entitled to complete relief from the automatic stay for cause at such hearing, and the occurrence of an Event of Default constitutes cause. **Interim Order, ¶ 17.** |
| Waiver of claims against Lender | The Debtor, in consideration of the DIP Loan financing to be made available, effective upon entry of the Final Order, shall waive and release any and all causes of action, claims, defenses and setoff rights against Lender, and its respective agents, representatives, assigns and |

| Material Provision | Summary Description and/or Location of Provisions in Relevant Documents |
|---|---|
| | successors. **Interim Order, ¶ 3** |
| Payment of Lender's costs, fees and expenses | All of Lender's costs and expenses related to the DIP Loan or to the chapter 11 case, and out-of-pocket expenses and the fees and expenses of Lender's counsel shall be included as the Post-Petition Obligations of the Debtor. **Interim Order, ¶ 2** |
| Carve Out | The DIP Loan Liens and the Replacement Liens shall be fully subordinate to (a) allowed professional fees of the Debtor and of any committee appointed pursuant to § 1102 of the Bankruptcy Code in an amount not to exceed $50,000, (b) all fees of the United States Trustee arising under 28 U.S.C. § 1930, and (c) fees due to the Clerk of the Court. **Interim Order, ¶ 8.** |
| Application of Collateral Proceeds | Subject to the Carve Out, the proceeds of any sale of the DIP Collateral shall be delivered to Lender to be applied by Lender to reduce the DIP Loan, and once the DIP Loan is paid in full, to reduce the amounts owed by the Debtor under the Pre-Petition Secured Loan Documents. **Interim Order, ¶ 6.** |

**Debtor's Motion for an Order (A) Authorizing the Debtor (I) to Pay Certain Prepetition Employee Objections and Related Claims and (II) to Continue to Provide Employee Benefits in the Ordinary Course of Business, and (B) Granting Other Related Relief**

46.     To minimize the personal hardship to Employees if prepetition Employee Obligations and Employee Benefits (as defined in the Motion) are not paid and to maintain morale during this critical time, the Debtor seeks entry of an order authorizing the Debtor, in its sole and absolute discretion, to pay and honor all Employee Obligations and to forward Withheld Amounts to the appropriate third-party recipient.

47.     In addition, the Debtor seeks authority, in its discretion to: (a) continue to maintain and provide all Employee Benefits provided by the Debtor in the ordinary course; and (b) pay all costs and expenses required to be paid under, or incident to, the Employee Benefits to

the extent any amounts accrued prepetition and/or accrued postpetition but related to the period prior to the Petition Date.

48.    Of the Debtor's active Employees, 8 are salaried Employees (the "Salaried Employees") and 111 are hourly Employees (the "Hourly Employees").

49.    The Employees continue to perform a variety of critical functions, and their knowledge and understanding of the Debtor's corporate infrastructure and business are essential. The services of the Employees are a critical component in preserving the Debtor as a going concern.  Therefore, the Debtor is requesting the continuance of certain Employee Benefits and Employee Obligations in order to enable the Debtors to retain and compensate the Employees.

### Employee Obligations

50.    In the ordinary course of business, the Debtor pays and honors certain amounts to its Employees (collectively, the "Employee Obligations") for, among other things, (i) Employees' wages, salaries, and other compensation, (ii) federal and state withholding taxes and other amounts withheld or deducted, including health insurance deductions, and (iii) vacation pay.

51.    The Debtor pays wages and other compensation to its Employees on a bi-weekly basis.  The Debtor's aggregate weekly gross payroll for all Employees including wages, salaries, and other forms of compensation averages approximately $35,000.00.   For purposes of administration and distribution of payroll, the Debtor utilizes S 2 HR Solutions1D, LLC as its payroll servicing provider for its Employees (the "Payroll Provider").  The Debtor remits gross payroll amounts, which includes the employee portion of all federal and state withholding taxes, employer's share of federal, state and local taxes, as well as voluntary and non-voluntary Employee deductions, to the Payroll Provider on a bi-weekly basis.

52.     The Debtor's pay period for its Employees begins on Monday of every other week, and ends on Sunday of every other week (the "Pay Period").  Employee wages are customarily funded to the Payroll Company on the first Wednesday following the end of an Employee Pay Period (or 3 days after the end of a Pay Period) and paychecks are distributed to Employees on the Thursday following the end of the Pay Period (the "Pay Day").  As of the Petition Date, the Debtor owes approximately $21,600.47.[2] to its Employees on account of accrued, but unpaid wages, salaries, and other compensation (collectively, the "Unpaid Wages and Salaries").

53.     Given the Debtor's use of the Payroll Provider, the Debtor does not directly withhold any amounts from Employee wages and salaries, nor does the Debtor directly remit any withheld amounts, or required federal, state or local taxes associated with the wages and salaries, to the appropriate taxing authorities.  The Payroll Provider is directly responsible for the withholding of all required taxes and deductions and the remittance of same to all appropriate governmental authorities and third parties.

54.     The Debtor's intent is to continue to utilize the Payroll Provider postpetition, in the ordinary course of business and in the same manner as prepetition, in accordance with the terms of its agreements with the Payroll Provider.

**Employee Benefits**

55.     In the ordinary course of Debtor's business operations, the Debtor provides its Employees with a number of benefits including without limitation: (i) medical and health

---

[2]    This amount does not take into account deductions for any federal or state taxes, or other voluntary or non-voluntary employee deductions required by law.

benefits, (ii) workers' compensation benefits, (iii) and vacation pay (collectively, the "Employee Benefits").

**a.**       **Health Benefits**

56.    The Debtor offers its Salaried Employees health insurance (the "Health Benefits") through Aetna Health Insurance.  The Health Benefits consist of general medical coverage for emergency and routine medical care, as well as pharmaceutical coverage. The Debtor funds one half of the premium for the individual Salaried Employee and the remaining portion of the premium is deducted from the individual Salaried Employee's earnings.  As of the Petition Date, the Debtor pays $2,996.55 each month to maintain the Health Benefits plan.

**b.**       **Workers' Compensation**

57.    The Debtor maintains workers' compensation insurance for all Employees which is through its Payroll Provider and it is with and administered by Tower Group (the "Agency"). The Debtor pays monthly premiums (the "Funded Premium") to the Agency to participate in the workers compensation insurance.  The Debtor's annual Funded Premium paid to the Agency is approximately $32,684.20.   The Debtor's next payment to the Agency, in the amount of approximately $1,492.11, is due by July 2, 2014.

58.    It is critical that the Debtor continues its workers' compensation insurance because coverage is required by law.  If workers' compensation coverage is not maintained as required, (a) the Debtor would have to acquire self-insured status, leading to much higher coverage costs, (b) the Employees could bring lawsuits for damages, and (c) the Debtor's officers could be subject to criminal liability.

**c.**       **Vacation Pay**

59.    The Debtor provides Salaried Employees with paid vacation.  Vacation accruals are based on years of service, such that each Salaried Employee, after the first full year of

service, is given forty hours paid time off and eighty hours paid time off after the second full year of service, plus sick pay for up to one week.

60.     In the event an Employee chooses not to use his or her vacation days, or separates from the Debtor prior to using his or her vacation days, the Employee retains the benefit of and is entitled to receive payment for any unused amount of vacation days.

61.     If an Employee wishes to use accrued vacation pay or separates from the Debtor (and meets the requirement for payment of accrued vacation pay), the Debtor wishes to honor this obligation to its Employees.

62.     I have been advised that in order to minimize the personal hardship to Employees, and in order to maintain morale during this critical time, it is in the best interest of the Debtor and its estate to seek entry of an order authorizing the Debtor, in its sole and absolute discretion, to pay and honor all Employee Obligations, to continue all Employee Benefits, and to forward Withheld Amounts to the appropriate third party recipients.

**Debtor's Motion for Order Authorizing Payment of Prepetition Trust Fund Taxes**

63.     In the ordinary course of its business, the Debtor withholds certain trust fund taxes (collectively, the "Trust Fund Taxes") from sales of goods and services subject to Florida state sales tax, as well as certain other local taxes imposed by the certain municipalities where Debtor operates from.

64.     The Debtor estimates that the aggregate prepetition amount for unpaid Trust Fund Taxes, as of the Petition Date, is approximately $32,467.00..

65.     The Debtor seeks authority to pay the Trust Fund Taxes collected prior to the Petition Date but not yet remitted by the Debtor to the applicable Taxing Authorities to avoid the

serious disruption that could result from the nonpayment of such taxes, including the distractions that could result from liability for nonpayment imposed on the Debtor's management.

66.    On May 18, 2014, the Debtor remitted Trust Fund Taxes to the Taxing Authorities in the amount of $32,635.00 on account of sales taxes due and owing the state of Florida.  In the event the May 18, 2014 payment(s) has not been cleared by Debtor's financial institution prior to the Petition Date, the Debtor requests that such payment(s) be authorized to be paid post-petition.

67.    Because the Trust Fund Taxes do not constitute property of the Debtor's estate, these amounts are not available to the Debtor's creditors.  Therefore, immediate payment of the Trust Fund Taxes to the appropriate Taxing Authorities will not adversely affect the Debtor's estate or its creditors.

68.    The Florida state and local Taxing Authorities can impose personal liability on management of entities responsible for collecting trust fund taxes when such taxes are collected without being remitted to the appropriate taxing authorities.  Thus, if any of the Trust Fund Taxes remain unpaid, the Debtor's management may be subject to lawsuits or even criminal prosecution.  Such proceedings would constitute a significant distraction for Debtor's management at a time when management should be focused on the Debtor's efforts to stabilize its postpetition business operations and develop and implement a successful restructuring strategy.

69.    I have been advised that in order to avoid potential audits by the state tax authorities and any potential adverse ramifications of the failure to remit the Trust Fund Taxes, it is in the best interests of the Debtor that the Court authorize the postpetition payment of the prepetition Trust Fund Taxes.

**Debtors' Motion for an Order Authorizing the Continued Use of Their Prepetition Cash Management System, Bank Accounts, and Business Forms**

70.     Given the Debtor's corporate and financial structure, it would be difficult for the Debtor to establish an entirely new system of Bank Accounts and a new Cash Management System.  Thus, under the circumstances, maintaining the Debtor's Cash Management System is in the best interests of the Debtor's estate and creditors. As a matter of course, the Debtor will continue to maintain records regarding all transfers of cash, so that all transactions can be ascertained, recorded, and traced.

71.     The Debtor seeks authority to continue the use of its prepetition:  (a) cash management system (the "Cash Management System"); (b) bank accounts (the "Bank Accounts"); and (c) business forms (which includes checks used with all of the Debtor's bank accounts) (the "Business Forms").  The Cash Management System is designed to permit the efficient collection, disbursement and application of funds.  The principal components of the Cash Management System are described below:

A.     The Debtor has a cash management system consisting of 2 business checking bank accounts in Florida including Bank of America Account No. ending 1030 (the "BOA Account") and Bank Leumi Account No. ending 8590 (the "Leumi Account").     The functions of each bank account are as follows:

- **The BOA Account:**  All customer cash and credit card receipts for services from all of Debtor's various locations and are deposited to the Debtor's BOA Account on a daily basis via ACH, wire transfer, check or otherwise.  Debtor's Food Vendors are linked to this account as well for the automatic debiting of payments due to each Food Vendor per the terms of Debtor's agreements with such Vendors.  Debtor also uses the funds in this account to pay its tax and payroll obligations. This account is used for cash disbursement and accounts payable, including general trade payables.  This account has an approximate balance of $8,359.61 as of the Petition Date.

- **The Leumi Account:** his account has been used for periodically in the past for receiving advances from Bank Leumi under the Debtor's loan agreements with Bank Leumi.  These loan agreements have since been assigned to Mida Farms LLC and the Bank Leumi Account is no longer being used.  This account has an

approximate balance of $0.00 as of the Petition Date.  Since the Bank Leumi Account is no longer required for the receiving of advances from Bank Leumi, Debtor intends to close the Bank Luemi Account and deposit any funds in the Bank Leumi Account into the Bank of America Account.

72.    The Debtor seeks relief from any requirement that it open new bank accounts upon the commencement of its chapter 11 case.  Since the Debtor no longer requires the Leumi Account for receiving funding from Bank Leumi, Debtor intends close the Leumi Account and deposit the funds from the Leumi Account in the BOA Account.

73.    The Debtor uses its Business Forms in the ordinary course of its business.  By virtue of the nature and scope of the business in which the Debtor is engaged and the large number of suppliers and customers with whom the Debtor has business relationships, it is essential for the Debtor to continue using the Business Forms without alteration or change.  To prevent unnecessary delay, confusion, and accrual of further expense to its estate, the Debtor requests that the Court waive any requirement of adding a "Debtor in Possession" legend or number to Debtor's Business Forms.

74.    Permitting the Debtor to maintain the use of the Cash Management System, BOA Account, and Business Forms will prevent disruption of the Debtor's operations and will not prejudice any party in interest.  The Debtor will maintain complete and accurate records of all transfers of funds in and out of the Bank Accounts.  The Debtor's existing Cash Management System functions smoothly and permits the efficient collection of cash for the benefit of the Debtor and all parties in interest. Any requirement that the Debtor open new bank accounts would potentially result in confusion and delay, thereby hindering the efficient use of the Debtor's resources.  Thus, the continued use of Debtor's Cash Management System, BOA Account and Business Forms is necessary and in the best interest of its estate.

**Debtors' Motion for Order Pursuant to 11 U.S.C. § 363(b)(1) Authorizing Continuation of Certain Customer Practices**

75.     The Debtor offers its customers the ability to purchase gift cards for redemption at its restaurants or any other Five Guys Burgers and Fries location (the "Gift Card Program"). Under this Gift Card Program, customers purchase gift cards which are redeemable as cash for payment of food, beverages, and other services provided at Five Guys Burgers and Fries restaurants nationwide.

76.     The objective of the Gift Card Program is to ensure customer satisfaction and generate goodwill, thereby retaining current customers and attracting new ones.

77.     As such, the Debtor seeks entry of an order authorizing, but not requiring, the Debtor to (a) continue to provide the Gift Cards Program in the ordinary course of the Debtor's business, and (b) honor and perform the obligations arising before the Petition Date and in the ordinary course of business, without further application to the Court.

78.     The ability to honor and perform the prepetition obligations under the Gift Card Program is essential to the Debtor's continued good business relations with its customers and provides both direct and indirect benefits for the Debtor.  If the Debtor were unable to honor the gift cards, Debtor would likely lose vastly more business than the amount paid to satisfy such claims, as a result of the destruction of goodwill and loss of customer satisfaction.

79.     In highly competitive markets and industries such as the Debtor's, failure to participate in the Gift Card Program for even a brief time might jeopardize the Debtor's efforts to restructure at the very outset.  The Debtor's continued ability to honor and process the gift cards is essential to maintaining the Debtor's business operations and continued customer loyalty. Without this ability, the Debtor would lose its customers' confidence in the ordinary course of business and customary practices of restaurant operations.

{4923380:11}                                                  22

80.     I believe the relief sought by this motion is essential because any delay in honoring such prepetition Gift Cards Obligations will severely and irreparably impair Debtor's customer relations.

**Debtor's Motion for Additional Time to File Schedules and Statements**

81.     The Debtor has nearly 170 creditors (including employees).  Given the size and complexity of Debtor's business and the fact that certain prepetition invoices have not yet been received or entered into the Debtor's financial accounting systems, the Debtor has not had the opportunity to gather the necessary information to prepare and file the schedules and statements of financial affairs required by section 521(1) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 1007 (the "Schedules and Statements").

82.     The conduct and operation of the Debtor's business requires the Debtor to maintain voluminous books and records and a complex accounting system.  The Debtor's employees are in the process of assembling the information necessary to complete the Schedules and Statements.  At this time, the Debtor is filing a list of creditors without claim amounts.

83.     In light of the significant number of creditors, the complexity of the Debtor's business, and the diversity of its operations and assets, I believe that the 15 day automatic extension of time to file the Schedules and Statements provided by Rule 1007(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") is not sufficient to permit completion of the Schedules and Statements.  Accordingly, the Debtors require additional time to assemble the information necessary to complete the Schedules and Statements.

84.     At this juncture, I estimate that 16 additional days (for a total of 30 days from the Petition Date) will provide sufficient time to prepare and file the Schedules and Statements.  As a result, the Debtor is requesting that the Court grant such an extension, without prejudice to the Debtor's right to seek any further extensions from the Court, to file all Schedules and Statements

{4923380:11}                                                  23

not previously filed pursuant to Bankruptcy Rule 1007(b) and (c) or to seek waivers with respect
to the filing of certain Schedules and Statements.  I submit that an order granting such relief is in
the best interests of the Debtor's estate, its creditors, and parties in interest.

**Emergency Motion of the Debtor for Entry of an Order Pursuant to 11 U.S.C. §
105(A) Authorizing Payment of Claims Asserted by Certain Food Vendors Against
Asic Broward, LLC Under the Perishable Agricultural Commodities Act, the
Packers and Stockyards Act, and 11 U.S.C. § 503(b)(9)**

85.     This motion seeks authorization for payment of claims asserted by US Foods
Corporation ("US Foods") and Five Guys Food ("Five Guys"  and collectively with US Foods, the
"Food Vendors") pursuant to 7 U.S.C. § 499a *et seq*., the Perishable Agricultural Commodities Act
("PACA"), 7 U.S.C. § 181 *et seq.,* the Packers and Stockyards Act ("PSA"), 11 U.S.C. § 503(b)(9)
against Debtor and related relief.

86.     I am advised that PACA applies to perishable agricultural commodities such as
fruits and fresh vegetables of every kind and character whether or not frozen or packed in ice
(collectively the "PACA Goods"). I am further advised that PSA is applicable to meat or meat
products, including poultry items (collectively, the "PSA Goods"). The PACA Goods and PSA
Goods are critical components of the Debtor's restaurant business.  Therefore, in order to avoid
disruption to the Debtor's business, it is essential that the Debtor be able to continue to pay these
types of claims in the ordinary course of business, as required by PACA and PSA.

87.     While Debtor is not admitting in the motion that it is subject to PACA, PSA or
that any claims asserted by the Food Vendors are entitled to protection under these statutes, out
of an abundance of caution and to preserve the going concern value of the Debtor and avoid
disruption in supplies of produce and meat products, which are critical to the Debtor's business,
the Debtor seeks authority to pay the Food Vendor Claims in the ordinary course of business.

88.     The Debtor's survival depends, in large part, on its ability to procure deliveries of
perishable goods protected by PACA and PSA.  Any delays - perceived or real - in satisfying

amounts owed to the Food Vendors could adversely and substantially affect the Debtor's ability to obtain fresh produce and meat products, thereby undercutting the Debtor's reorganization and sale prospects.  Finally, as set forth in the motion, the Food Vendors would, in any event, be entitled to payment from the applicable statutory trust ahead of the Debtor's other creditors and outside of any plan of reorganization.  Thus, I believe payment of the Food Vendor Claims will not prejudice the Debtor's other creditors.

89.    In this case, the Debtor purchases PACA Goods and PSA Goods, primarily in the form of fresh vegetables for menu items, and beef or other meat items to sell to retail customers at their restaurants.  The Debtor estimates that Five Guys is currently owed approximately $18,172.91 and US Foods is owed approximately $88,196.87 for an aggregate total of $106,369.78 owed to the Food Vendors as of the Petition Date on account of asserted PACA Goods and PSA Goods.

**Debtor's Application for Authority to Retain and Employ McDonald Hopkins LLC as Counsel for the Debtors *Nunc Pro Tunc* to the Petition Date**

90.    The Debtor seeks to retain McDonald Hopkins LLC ("McDonald Hopkins") as its counsel, effective as of the Petition Date, because of the firm's (a) extensive experience and knowledge in the field of debtors' and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code; (b) expertise, experience and knowledge with respect to franchise debtors; and (c) ability to quickly respond to all issues that may arise in the Debtor's Chapter 11 Case.  I believe that McDonald Hopkins' appearance before this Court as counsel in the Chapter 11 Case will be efficient and cost effective for the Debtor's estate.

91.    Accordingly, I believe that McDonald Hopkins is both well qualified and able to represent the Debtor in an efficient and timely manner.

## III.  Conclusion

In order to minimize any loss of value to its business, the Debtor's immediate objective is to engage in business as usual following the commencement of the Chapter 11 Case, with as little interruption to the Debtor's operations as possible.  I believe that if this Court grants the relief requested in each First Day Motion, the prospect for achieving these objectives, to the maximum benefit of creditors and the Debtor's estate, will be substantially enhanced.

_____
CRAIG COHEN
Manager

SUBSCRIBED and SWORN TO before me
this 23rd day of June, 2014.

EDY A CAMPOVERDE
Notary Public
State of New Jersey
My Commission Expires June 12, 2018
I.D. # 2435009

{4923380:11}

26